J-A11028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| PRESTIGE FUND A, LLC; PRESTIGE FUND A II, LLC; PRESTIGE FUND A V, LLC; PRESTIGE FUND A VI, LLC; PRESTIGE FUND A VII, LLC; PRESTIGE FUND A IV, LLC; PRESTIGE FUND A IX, LLC; PRESTIGE FUND B, LLC; PRESTIGE FUND B II, LLC; PRESTIGE FUND B IV, LLC; PRESTIGE FUND B V, LLC; PRESTIGE FUND B VI, LLC; PRESTIGE FUND B VII, LLC; PRESTIGE FUND B BTM I, LLC; PRESTIGE FUND D, LLC; PRESTIGE FUND D III, LLC; PRESTIGE FUND D IV, LLC; PRESTIGE FUND D V, LLC; PRESTIGE FUND D VI, LLC; PRESTIGE FUND D BTM I, LLC; WF VELOCITY I, LLC; WF VELOCITY IV, LLC; WF VELOCITY V, LLC; WF VELOCITY VI, LLC; WF VELOCITY VII, LLC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| v. | No. 197 MDA 2025 |
| | |
| PARAMOUNT MANAGEMENT GROUP, LLC | |
| | |
| APPEAL OF: DARYL F. HELLER | |

Appeal from the Order Entered January 10, 2025
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-24-06012

BEFORE:  BECK, J., NEUMAN, J., and BENDER, P.J.E.

MEMORANDUM BY NEUMAN, J.:                    **FILED: AUGUST 10, 2026**

Daryl F. Heller appeals from the trial court's January 10, 2025 order

finding Paramount Management Group, LLC ("Paramount") in civil contempt,

and directing the sums assessed against Paramount pursuant to the trial court's December 6, 2024 order in the amount of $2,050,000, shall be added to the judgment and be paid jointly and severally by Paramount and Mr. Heller. We affirm.

## Case History

The trial court summarized the background of this matter as follows:

### I. BACKGROUND

At the heart of this case lies a tangled web of business ventures, once shimmering with the allure of lucrative returns, now unraveling into a cautionary tale of business failures and betrayal. The Plaintiffs[/Appellees], collectively referred to as "the Funds," are a group of distinct limited liability companies incorporated in Delaware and Pennsylvania[, consisting of: Prestige Fund A, LLC; Prestige Fund A II, LLC; Prestige Fund A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A IV, LLC; Prestige Fund A IX, LLC; Prestige Fund B, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V, LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC; Prestige Fund D, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V, LLC; Prestige Fund D VI, LLC; Prestige Fund D BTM I, LLC; WF Velocity I, LLC; WF Velocity IV, LLC; WF Velocity V, LLC; WF Velocity VI, LLC; WF Velocity VII, LLC]. These investment funds, comprising approximately 2,700 investors, each contributing over $700 million, have placed all their eggs in ATMs as the Funds' sole investment. The Funds are managed by a series of entities: Prestige Funds Management, LLC ("PFM"), Prestige Funds Management II, LLC ("PFM II"), Prestige Funds Management III, LLC ("PFM III"), and WF Velocity Funds Management, LLC ("WF") (collectively, "the Managers"). Prestige Investment Group, LLC is the sole member of PFM, the Majority Member of PFM II and PFM III, and the sole Class A Member and controlling member of WF. As such, Prestige Investment Group, LLC holds the controlling interest in all of the managing entities and, consequently, in the Funds themselves. These types of layered limited liability entities are endemic in this case.

Defendant, Paramount…, is the entity entrusted with managing the Funds' ATM portfolio. The Funds purchased the ATMs from Paramount, which retained operational control and management of the machines on the Funds' behalf. Paramount specializes in providing comprehensive ATM management services across a wide range of industries, including, but not limited to, convenience stores, pharmacies, and hospitality establishments. Typically, Paramount or its investors own the ATMs, with Paramount managing all aspects of the operation, including cash logistics, secure processing, maintenance, and customer support. Paramount's portfolio is acquired through a combination of cash purchases and, occasionally, equity splits. Service agreements are often structured to allow the seller to continue providing cash delivery and maintenance, with compensation typically tied to cash withdrawals.

[I]n April 2012, [Mr.] Heller … and Jerry D. Hostetter … entered into an Amended and Restated Agreement for Prestige Investment Group, LLC. [Mr.] Heller, as the majority Class A Member, owning 60% of the Class A interests, and [Mr.] Hostetter[,] owning 40% of the Class A interests, control[] the actions of Prestige Investment Group and its affiliated entities, including the Managers and the Funds. Additionally, [Mr.] Heller is the chairman and majority owner of Paramount, as well as the CEO of Heller Capital Group, which is the controlling member of Paramount.

Notably, at the start of this action, [Mr.] Heller found himself intricately entangled in this dispute due to his influential role on both sides of the case. On one hand, he serves as the chairman and majority owner of Paramount…, the Defendant, which is accused of failing to meet its contractual obligations to the Funds. As the CEO of Heller Capital Group, which is the majority, if not sole, member of Paramount, [Mr.] Heller holds significant control over the operations and decisions of Paramount. On the other hand, [Mr.] Heller also controls Prestige Investment Group, LLC, the entity that holds the majority of Class A members in the Managers overseeing the [P]laintiff Funds. Through this position, he is in control of the management of the Funds and their legal actions. This dual position places [Mr.] Heller at the center of the dispute, as he is both the manager of the Funds seeking legal redress and the owner of the company accused of breaching its contractual obligations, further complicating the legal landscape of this case.

However, [Mr.] Heller's entanglement did not hinder the Funds from pursuing legal redress. As background for the exact issue in this case, between 2020 and 2024, Paramount entered into ATM Management Services Agreements ("MSAs") with each of the Funds. These agreements stipulate that all revenue generated from the ATMs is initially directed to Paramount to cover operational costs, with any remaining funds to be remitted to the Funds as set forth in each MSA. Under the terms of the MSAs, if Paramount fails to make the agreed-upon monthly payments, the Funds must provide written notice and a 20-day period to cure the non-payment. Should Paramount fail to cure, the MSAs allow the Funds to terminate the agreements upon written notice.

Paramount met its payment obligations through March 2024. However, starting in April 2024, Paramount ceased making payments, leaving 25 payments, across 25 entities comprising the Funds, totaling $16,369,033.52 of unpaid payments. This failure to remit payments continued through August 2024. On August 2, 2024, the Funds sent a formal notice of non-payment to Paramount, demanding payment by August 22, 2024. When Paramount failed to comply, the Funds, on August 23, 2024, invoked their right to terminate the MSAs and demanded the prompt transfer of ATM-related information.

By the time the initial Complaint was filed in August 2024, Paramount had failed to remit 100 payments, spanning April through July, totaling $65,422,167.08. As of the filing of this Opinion[ on January 10, 2025], Paramount has failed to remit any additional payments to the Funds, bringing the total amount of unpaid revenue to approximately $130,854,421.00.

## II. PROCEDURAL HISTORY

On August 23, 2024, [the Funds] filed their Complaint alleging Count I – Breach of Contract, Count II – Breach of Contract, and Count III – Injunctive Relief. Along with the filing of its Complaint, [the Funds] also filed a Petition for Special Injunction and Preliminary Injunction on August 23, 2024, for which this [c]ourt held a hearing on August 26, 2024. Additionally, on August 26, 2024, [Paramount] filed its Answer with New Matter and Counterclaim. [Paramount's] Counterclaim alleges Specific Performance. Then, on August 26, 2024, [Paramount] filed its Answer to [the Funds'] Petition for Special Injunction and Preliminary Injunction, and on August 27, 2024, it filed a Brief in

- 4 -

Opposition to [the Funds'] Petition for Special Injunction and Preliminary Injunction.

After the August 26 hearing, on the issue of [the Funds'] Petition for Special Injunction and Preliminary Injunction, the [c]ourt found injunctive relief unnecessary in its [o]rder dated[] August 27, 2024. Specifically, the [c]ourt found that [the Funds] failed to meet the requirement of establishing the viability of [Paramount's] enterprise as in such a precarious position that the only way to preserve the enterprise is through extraordinary relief. While the [c]ourt found [Mr.] Heller's testimony during the August 26 hearing to be credible in representing the financial position of [Paramount], the problematic pleading posture of the case also remained an issue. As the case was pl[ed], in some capacity [Mr.] Heller was suing [Mr.] Heller.

On September 3, 2024, [the Funds] filed a Motion for Entry of a Rule to Show Cause and Scheduling a Preliminary Injunction Hearing, arguing that the [c]ourt never addressed [the Funds'] request for a Preliminary Injunction. The [c]ourt entered an [o]rder dated September 4, 2024, issuing a Rule to Show Cause upon [Paramount] to show why [the Funds] are not entitled to the relief requested and scheduling a subsequent hearing for October 15, 2024.

Subsequently, on September 11, 2024, [the Funds] filed Preliminary Objections to [Paramount's] Answer to Complaint with New Matter and Counterclaim. The [c]ourt never made a ruling on [the Funds'] Preliminary Objections because on September 12, 2024, a Joint Praecipe to Discontinue All Claims and Counterclaims and Mark the Case Closed was filed with the Prothonotary. [Mr.] Heller, as both the manager of the Funds seeking legal redress and the owner of the company accused of breaching its contractual obligations, hired legal counsel to represent [the Funds] as it is within his contractual rights.[1] However, also on September 12, 2024, the attorneys that had been representing the [Funds] thus far filed an Emergency Petition to Strike the Discontinuance. Due to the overlapping nature of [Mr.] Heller's control within both companies, in an [o]rder dated September 16,

---

[1] Different legal counsel had initiated the action on behalf of the Funds and represented the Funds up to this point in the proceedings. Thus, after Mr. Heller hired legal counsel to represent the Funds, there were multiple attorneys purporting to represent the Funds.

2024, the [c]ourt directed each party, and the new attorneys appointed by [Mr.] Heller, to brief the Petition to Strike the Discontinuance.

The [c]ourt notes that one of the biggest and unresolved issues within the original [Funds'] case is the issue of standing to sue. Apparently to address this issue, the parties filed a Stipulation entered by the court on September 24, 2024, where a stay of proceedings [would be in] effect unless a "Triggering Event" occurred. Upon the occurrence of a "Triggering Event," it was stipulated that [Mr.] Hostetter "shall immediately assume a majority and super majority governing interest in[,] and majority and super majority voting control of[,] Prestige Investment Group, LLC; and the Joint Praecipe to Discontinue All Claims and Counterclaims and Mark the Case Closed filed on September 12, 2024[,] in the Fund Litigation shall be struck off and the Fund Litigation reinstated." Subsequently, a "Triggering Event" occurred[,] and [Mr.] Hostetter gained standing to reinstate the lawsuit as, per the [S]tipulation, [Mr.] Hostetter now controlled Prestige Investment Group, LLC, who in turn, controlled the Funds.

Nevertheless, [the Funds] and [Paramount] began a series of negotiations in order to settle the dispute between the parties. On November 21, 2024, the [c]ourt [o]rdered a Consent Judgment to be entered in favor of [the Funds] and against [Paramount] in the amount of $138,156,118.38. The Consent Judgment further [o]rdered [Paramount] to supply to [the Funds] a complete inventory of all ATM [u]nits purchased by [the Funds], or members of [the Funds], from [Paramount within two days of the date of the Consent Judgment], and that [Paramount] is to assign and transfer all of [Paramount's] rights, title, and interest to [the Funds'] ATM units[,] as well as the location agreements, permits, ATM passwords and combinations, and all vendor and other contracts or agreements relating to [the Funds'] ATM units[, within seven days of the date of the Consent Judgment].

On December 3, 2024, [the Funds] filed an Emergency Motion for Contempt, a Brief in Support of Emergency Motion for Contempt, a Motion for Miscellaneous Relief, and a Brief in Support of a Motion for Miscellaneous Relief. [In the Funds' Emergency Motion for Contempt, they stated Paramount failed to comply with the Consent Judgment by, at a minimum, not satisfying any portion of the monetary judgment, and not assigning and transferring all accounts receivable and ATM units, along with the related location

agreements and information.] Subsequently, in this [c]ourt's [o]rder dated December 4, 2024, a Civil Contempt Hearing was scheduled for December 6, 2024. [The trial court ordered Mr. Heller to be present at the Civil Contempt Hearing for Paramount, and he attended and exercised his Fifth Amendment rights.] After the Civil Contempt Hearing, the [c]ourt entered an [o]rder, dated December 6, 2024, finding [Paramount] in [c]ontempt of … [c]ourt for failing to [c]omply with the Consent Judgment and Order of November 21, 2024. The [c]ourt required that for Paramount to purge itself of the contempt it must: (a) remit to [the Funds] all profits generated by [the Funds'] ATM units from November 21, 2024, to the date Paramount's contempt is purged; (b) execute and deliver to [the Funds] a document assigning and transferring Paramount's right, title, and interest to [the Funds'] ATM units as well as the [l]ocation [a]greements, [p]ermits, ATM passwords and combination[s], and all vendor and other contracts or agreements relating to [the Funds'] ATM units (excluding the communication modems installed in any of [the Funds'] ATM units[)]; and (c) supplying various data information to counsel for [the Funds as specified in the order]. [The trial court ordered Paramount would be assessed a contempt fine as outlined in its order until the contempt was purged. The trial court instructed, upon delivery of all items set forth above, Paramount shall file a certification with the court that it has complied with the order, and the Funds shall file a certification verifying Paramount's compliance or noncompliance within 24 hours.]

After a status conference held via Zoom on December 19, 2024, another Civil Contempt Hearing was scheduled for December 30, 2024, following [the Funds'] Second Emergency Motion for Contempt filed on December 20, 2024, due to [Paramount's] alleged noncompliance.[2] [The trial court ordered Mr. Heller to appear in person at the December 30, 2024 Civil Contempt

_____

[2] The record indicates there was disagreement over what the term 'profits' meant in the trial court's December 6, 2024 order. Paramount argued it meant net profit, while the Funds claimed it meant a valuable return or gain. Following the December 19, 2024 status conference, the trial court entered an order that same day instructing, *inter alia*, "[a]ll profits, revenues, or any other revenue streams or proceeds generated by [the Funds'] ATM [u]nits but currently going into accounts of [Paramount] shall be remitted to [the Funds] by [Paramount] no later than midnight tonight." Order, 12/19/24, at ¶ 4. In the Funds' Second Emergency Motion for Contempt, they averred Paramount did not comply with this directive in any way.

Hearing, and to be prepared to respond to the Funds' assertions of contempt including failing to produce documents; retaining income streams from ATM units owned by the Funds; interfering with the production of information, and failing to provide access to software to run the ATM system. In advance of the hearing, the Funds filed stipulations entered into between the Funds, Paramount, and various witnesses who the Funds would have called at the hearing to testify. One such stipulation was entered into by the Funds, Paramount, and Mr. Heller, and indicated that in response to certain questions that would be asked to Mr. Heller by the Funds at the December 30, 2024 Civil Contempt Hearing, Mr. Heller would answer each of the questions by invoking his Fifth Amendment right against self-incrimination. In the stipulation, Paramount agreed that no other witness is capable of answering the questions on behalf of Paramount, and that based on Mr. Heller's invocation of Fifth Amendment protections, an adverse inference can be taken by the trial court against Paramount regarding the answer to each question. In addition to the stipulations, the Funds filed a proposed order, in which it proposed, among other things, that both Paramount and Mr. Heller be held in contempt, and that Paramount and Mr. Heller be jointly and severally liable for the penalties assessed against Paramount pursuant to the trial court's December 6, 2024 order, which Paramount said amounted to $2,050,000, as of December 30, 2024.

Following the December 30, 2024 Civil Contempt Hearing, the trial court ordered the Funds to file a brief in support of their motion and proposed order, and permitted Paramount and Mr. Heller to file responses. In the Funds' January 3, 2025 brief, they explained, *inter alia*, that Paramount and Mr. Heller stand in contempt of the court's November 21, 2024, December 6, 2024, and December 19, 2024 orders in the following ways: (1) they have not submitted to the Funds all profits generated by the Funds' ATM units since November 21, 2024[3]; (2) they have not remitted a complete inventory of all ATMs owned by the Funds; (3) they have failed to timely remit data regarding the Funds' ATM units, and left the units saddled with debt so as to render them of limited value; and (4) they have not certified compliance with the December 6, 2024 order. The Funds argued the trial court should order Paramount to comply with the prior orders, certify

---

[3] The Funds stated they had so far received approximately $140,000, but Paramount did not certify this amount comprised all of the profits or revenues.

compliance, pay its contempt fine, and should increase the value of the judgment. If Paramount did not certify compliance, the Funds advanced the court should appoint, at Paramount's expense, a forensic auditor. The Funds also claimed Mr. Heller should be subject to contempt for Paramount's violations of the court's orders as he actively participated in the violations. Specifically, the Funds say Mr. Heller terminated most of Paramount's staff that would have effectuated compliance with the court's orders on December 13, 2024. The Funds further claimed Mr. Heller caused Paramount's financial misfeasance and directed Paramount to use funds in a manner that created its alleged financial distress which Paramount now claims makes compliance impossible.

Mr. Heller filed a brief in opposition on January 8, 2025. He argued, among other things, the trial court is not required to draw an adverse inference from his invocation of the Fifth Amendment; there is not case law applying participation theory in matters involving contempt of court, thereby suggesting he should not be held personally liable; he did not remove and terminate staff to interfere with compliance with the court's orders; and that the Funds' reasons for finding Mr. Heller in contempt are otherwise insufficient and not supported by the record.

Paramount likewise filed a brief in opposition on January 8, 2025. Paramount argued, among other things, it had no profits to remit after November 21, 2024, as ordered by the court on December 6, 2024, noting Paramount's continued financial distress and the ambiguity in the trial court's order as to what 'profit' meant; it has endeavored to comply with the court's December 19, 2024 order with respect to remitting revenue generated by the Funds' ATMs and has wired around $172,000.00 to the Funds; Paramount has no staff or money that could allow it to certify a complete inventory of Fund-owned ATMs or hire an auditor to do so; and Paramount gave the Funds access to its management software and all acquisition contracts.]

While the case has unfolded, other creditors of Paramount have sought to intervene in this litigation to protect their positions. On December 10, 2024, Traditions Bank sought to intervene because it is in the midst of litigating a dispute with Paramount in York County, Pennsylvania, alleging that Paramount had breached obligations to Traditions Bank. Paramount did not respond to the lawsuit and Traditions Bank now ha[s] a default judgment. On December 27, 2024, Customers [Bank] filed a petition to

intervene. Customer Bank seeks to intervene due to alleged default by Paramount and a company known as Blackford Holdings, LLC[1] for a $5,914,530.78 judgment entered by confession in the Court of Common Pleas of Chester County, Pennsylvania. The common denominator in all of the cases is [Mr.] Heller.

> [1] Customers Bank alleges that [Mr.] Heller is the [m]anaging member of Blackford Holdings, LLC.

Trial Court Opinion ("TCO"), 1/10/25, at 1-7 (citations omitted).

In response to the Funds' Second Emergency Motion for Contempt, the trial court entered an opinion and order on January 10, 2025, finding Paramount in civil contempt after review of all pending contempt matters and ordering "the sums assessed against Paramount pursuant to the December 6, 2024 [o]rder, in the amount of $2,050,000[,] shall be added to the judgment and this amount only shall be paid jointly and severally by Paramount and [Mr.] Heller." Order, 1/10/25. The trial court denied the Funds' other requests for sanctions and relief.

On February 7, 2025, Mr. Heller filed a timely notice of appeal from the trial court's January 10, 2025 order.[4] The trial court ordered Mr. Heller to file a Pa.R.A.P. 1925(b) concise statement, and he timely did so. The trial court then issued a statement pursuant to Rule 1925(a), indicating it was relying on the reasoning set forth in its January 10, 2025 opinion. The appeal was subsequently stayed on March 25, 2025, after Mr. Heller initiated bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey at No. 25-11354-(JNP). The stay was lifted on June 18, 2025.

---

[4] Paramount did not appeal.

- 10 -

On appeal, Mr. Heller raises two questions for our review:

1. Whether the [t]rial [c]ourt erred by finding [Mr.] Heller, in his individual capacity, in civil contempt for the actions of Paramount…?

2. Whether the [t]rial [c]ourt erred by assessing a $2,050,000.00 civil contempt fine to be paid jointly and severally by Paramount … and [Mr.] Heller?

Mr. Heller's Brief at 5.[5, 6]

_____

[5] Paramount did not file a brief.  The Funds filed a five-page appellate brief, explaining their support of the trial court's decision is not "as full-voiced as it once may have been, because — due to events transpiring since this appeal began — the [c]ontempt [o]rder sanction represents a mere thimble of water in the now vast ocean of Heller debts, filled by his pervasive wrongdoing." Funds' Brief at 2.  Further, while the Funds claim Mr. Heller's bankruptcy and other legal matters have rendered this appeal a largely academic exercise, it appears to us that those proceedings are still ongoing based on the information set forth in the Funds' brief, such that this appeal is not moot.

[6] Mr. Heller's brief fails to comply with our Rules of Appellate Procedure, specifically Pa.R.A.P. 2116(a) and 2119(a).  *See* Pa.R.A.P. 2116(a) ("The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail.  The statement will be deemed to include every subsidiary question fairly comprised therein.  No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").   While Mr. Heller raises two rather general questions in his statement of questions involved, he divides his brief into five more specific arguments, which we address *infra*.  *See* Mr. Heller's Brief at 11 ("I. [Mr. Heller] is not a party to the action, and should not be held in contempt for the actions of a corporation in a suit sounding in contract.") (emphasis omitted); *id.* at 17 ("II. [Mr. Heller] was unable to ensure compliance with the [o]rder and [the Funds] failed to prove, by a preponderance of the evidence, that [Mr. Heller] had the ability to do so.") (emphasis omitted); *id.* at 21 ("III. The [t]rial [c]ourt was not required to draw an adverse inference from [Mr.
*(Footnote Continued Next Page)*

## Analysis

### *Appelability*

At the outset, we address the appealability of the trial court's January 10, 2025 order, which we may consider *sua sponte*. **See Hanbicki v. Leader**, 294 A.3d 1234, 1238 (Pa. Super. 2023). "[A] contempt order is final and appealable if the order contains (1) a present finding of contempt and (2) an imposition of sanctions." **Id.** at 1239 (citation omitted).

Here, the trial court's January 10, 2025 order contains a present finding of contempt, albeit against Paramount, not Mr. Heller.[7] It also imposes a $2,050,000 sanction against Paramount and Mr. Heller. Therefore, we consider the January 10, 2025 order to be appealable.

### *Standing*

We next assess Mr. Heller's standing to appeal the trial court's January 10, 2025 order. Pursuant to Pa.R.A.P. 501, "[e]xcept where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom." Pa.R.A.P. 501. While Mr. Heller is aggrieved by the January 10,

_____

Heller's] invocation of his Fifth Amendment [r]ights.") (emphasis omitted); **id.** at 23 ("IV. Civil contempt sanctions cannot be punitive as they were against [Mr. Heller].") (emphasis omitted); **id.** at 25 ("V. Assuming sanctions could or should be imposed, they cannot date back to the period where the definition of 'profits' made the directive too vague to be enforced.") (emphasis omitted). Although we do not condone failing to abide by Rules 2116(a) and 2119(a), we will overlook Mr. Heller's violation, as his noncompliance has complicated, but not completely impeded, our review.

[7] We discuss Mr. Heller's standing to file this appeal further *infra*.

2025 order in that he was held jointly and severally liable for the contempt fine, we recognize he is not a named party to this action. **See Interest of K.C.**, 156 A.3d 1179, 1182 (Pa. Super. 2017) ("A party is aggrieved when the party has been adversely affected by the decision from which the appeal is taken.") (cleaned up); **see also** 42 Pa.C.S. § 102 (defining 'party' as "[a] person who commences or against whom relief is sought in a matter"). Nevertheless, Mr. Heller's standing to appeal has not been independently raised by the parties, and we may not consider it *sua sponte*. **See Interest of R.P.**, 344 A.3d 783, 789 (Pa. Super. 2025) (observing this Court may not *sua sponte* quash appeal pursuant to Rule 501). Thus, we need not decide whether Mr. Heller has standing to file this appeal and proceed to review Mr. Heller's issues.

*Relevant Contempt Law and Trial Court's Reasoning*

To provide context for Mr. Heller's arguments, we preliminarily set forth the relevant law pertaining to contempt and the trial court's reasoning for finding Mr. Heller in contempt. We note:

> This Court's review of a civil contempt order is limited to a determination of whether the trial court abused its discretion. If a trial court, in reaching its conclusion, overrides or misapplies the law or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record, then discretion is abused.

**Hanbicki**, 294 A.3d at 1240 (citation omitted).

> For a person to be found in civil contempt, the moving party must prove that: (1) the contemnor had notice of the specific order or decree that he disobeyed; (2) the act constituting the violation

- 13 -

was volitional; and (3) the contemnor acted with wrongful intent. The order alleged to have been violated must be definite, clear, and specific—leaving no doubt or uncertainty in the mind of the contemnor of the prohibited conduct and is to be strictly construed.

**Gunther v. Bolus**, 853 A.2d 1014, 1017 (Pa. Super. 2004) (cleaned up).

We have explained,

[t]he power to punish for contempt, including the power to inflict summary punishment, is a right inherent in the courts and is incidental to the grant of judicial power under the Constitution. The court may order civil or criminal contempt.

The characteristic that distinguishes civil from criminal contempt is the ability of the contemnor to purge himself of contempt by complying with the court's directive. If he is given an opportunity to purge himself before imposition of punishment, the contempt order is civil in nature. If the purpose of the order is to punish despite an opportunity to purge, the order is criminal in nature.

A court may exercise its civil contempt power to enforce compliance with its orders for the benefit of the party in whose favor the order runs but not to inflict punishment. A party must have violated a court order to be found in civil contempt. The complaining party has the burden of proving by a preponderance of evidence that a party violated a court order.

However, a showing of non-compliance is not sufficient in itself to prove contempt. If the alleged contemnor is unable to perform and has in good faith attempted to comply with the court order, contempt is not proven. The alleged contemnor has the burden of proving the affirmative defense that he has the present inability to comply with the court order.

**In re Estate of DiSabato**, 165 A.3d 987, 992 (Pa. Super. 2017) (cleaned up; unnecessary capitalization omitted). Further, when imposing a purge condition after civil contempt is found,

the use of the court's civil contempt power to enforce compliance with a court order is to be exercised with the objective of compelling performance, and not inflicting punishment; thus, a court may not convert a coercive sentence into a punitive one by

- 14 -

imposing conditions that a contemnor cannot perform and thereby purge himself of contempt. …

[Coercive] conditions … must be such with which the court is convinced beyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply.

**Wetzel v. Suchanek**, 541 A.2d 761, 763-64 (Pa. Super. 1988) (cleaned up).[8]

Here, in finding Mr. Heller in contempt, the trial court explained, in relevant part:

While the court appreciates the arguments made by counsel at the December 30, 2024[] hearing and in their briefs, this decision must be governed by the facts submitted by the parties by stipulation and proper affidavits. Moreover, given the fact that [Mr.] Heller has asserted his 5th Amendment rights against self-incrimination in response to many questions the Funds would ask him, the court takes a negative inference against Mr. Heller with respect to any responses such that they would be against his and Paramount's interest.

\*\*\*

---

[8] Our Supreme Court recently considered an appeal concerning a child support contemnor's claim that he was unable to pay the purge condition set by the trial court. **Bredbenner v. Hall**, 353 A.3d 683, 686 (Pa. Super. 2026) (Opinion Announcing the Judgment of the Court); **see also Cimaszewski v. Bd. of Prob. and Parole**, 868 A.2d 416, 423 n.10 (Pa. 2005) (noting an Opinion Announcing the Judgment of the Court is not binding precedent). The Court confirmed that, in making the initial contempt finding, "the petitioner has the burden to show, by a preponderance of the evidence, that the obligor violated a court order; then, the obligor has the burden to demonstrate an inability to comply such that the failure was not willful." **Bredbenner**, 353 A.3d at 694-95 (footnote omitted). It also determined that, "in civil support contempt proceedings, a trial court must attach an attainable condition so that the obligor may purge himself of contempt. The record must support the obligor's ability to meet that condition. The burden is on the petitioning party to develop that record. The record is inadequate if it merely contains the discredited testimony of the obligor." **Id.** at 695-96 (footnote omitted).

While the burden is on the complaining party to prove noncompliance by a preponderance of the evidence, the present inability to comply is an affirmative defense that must be proved by the alleged contemnor. ***Cunningham v. Cunningham***, … 182 A.3d [464,] 471 ([Pa. Super.] 2018). Paramount has not made an argument that it is impossible to comply with the court's orders other than the fact that all employees were fired. Paramount created its impossibility to perform[,] undermining any defense on this basis. ***Barrett v. Barrett***, … 368 A.2d 616, 621 ([Pa.] 1977); ***see also Cunningham***…, 182 A.3d [at 471] (the defense of impossibility of performance is only available to a party in a contempt proceeding if the impossibility to perform is not due to the actions of that party[).]

The stipulations submitted for the December 30, 2024[] hearing make clear that Paramount is in civil contempt of court orders in at least three out of the four areas alleged by the Funds. Paramount has not certified compliance, has not provided a complete inventory of all Fund-owned ATMs, [and] did not timely provide data regarding Fund ATMs. With respect to "profits" not being provided per the order, it is necessary that the moving party prove the order clear, leaving no doubt or uncertainty in the mind of the contemnor o[f] the prohibited conduct. Here, the Funds seemed to intend that "profits" means gross profits or income streams rather than net profits. The term is not clear enough to hold Paramount in contempt.

Despite the fact of contemptuous conduct, Paramount made significant progress as of December 30, 2024, to remedy certain areas of contempt. For example, Paramount has been transmitting funding streams to the Funds. Paramount has provided a list of Fund-owned ATMs and continues to arrange for transfer of physical access to certain ATMs. Paramount has provided access to data needed to operate the ATMs. All of this appears to be too little too late for the Funds to recover much of their investment and would likely have been too late even if such orders had been entered in early 2024. What started off as investment returning income to the Funds appears to have transformed into at best a significant under-capitalized expansion of ATM buying or at worst a Ponzi scheme.

\*\*\*

- 16 -

[T]he [contempt fine] accrual will cease as of December 30, 2024. The penalty accrued as of December 30, 2024, in the amount of $2,050,000[,] shall be added to the judgment.

\*\*\*

The Funds insist that the court should hold [Mr.] Heller personally liable for contempt because he "caused Paramount to violate this [c]ourt's [o]rders."  In support of this request, the Funds point to the following actions by [Mr.] Heller:

> 1. Terminating staff while knowing some were needed to provide information as ordered by the court;
>
> 2. Directing Paramount to pay one of his other companies, Heller Capital Group, in excess of $300,000 with income from the Fund[s'] ATM units;
>
> 3. Directing the movement of funds between Paramount bank accounts and other Heller-controlled bank accounts; and[]
>
> 4. Directing that Paramount withhold $700,000 in funds available to Paramount to pay the Funds for a contempt fine.

In support of holding [Mr.] Heller personally liable, the Funds rely on *N*. *Strabane Twp. v. Majestic Hills LLC*, [329 A.3d 87 (Pa. Cmwlth. 2024)].  This case is controlling as well as persuasive to the court.  The procedural history of Majestic Hills is important to this case.  Majestic Hills, LLC developed a parcel of land in North Strabane Township into 200 home lots.  Majestic Hills, LLC is wholly owned by JND, which in turn is wholly owned and controlled by the DeNardos, who are husband and wife, with each owning 50%.  Mr. DeNardo is the managing member of JND.  The project ran into issues with numerous compliance requirements that caused landslides at the development.  North Strabane Township sued Majestic Hills, LLC, JND, and the DeNardos.  The parties entered a consent decree, part of which[] dismissed the DeNardos from the case.

Subsequently, JND refused to comply with portions of the consent decree[,] causing the Township and the Pennsylvania Department of Environmental Protection to file for a preliminary injunction against Majestic Hills, LLC, JND, and the DeNardos[,] requesting that none of the defendants dissipate assets "in anticipation of civil liability or contempt sanctions."  The trial court entered an

order to this effect. The Township also filed a petition for contempt of the consent decree.

The trial court then heard testimony on the petition for contempt, a case in which the DeNardos were not defendants. The court found that the DeNardos were sophisticated real estate developers, the DeNardos and JND were one and the same, and the DeNardos did not have the financial ability to pay for compliance when the consent decree was signed. The trial court awarded $275,000 as a compensatory sanction against the DeNardos, JND, and Majestic Hills, LLC, jointly and severally. The DeNardos appealed contending they were not defendants in the consent decree case and could not be held in contempt or sanctioned for JND's noncompliance.

On appeal, the Commonwealth Court reaffirmed that[] "[a]n officer of a corporation can be held in contempt of that corporation's noncompliance even when not named as a defendant in the action." Quoting from the Supreme Court of the United States, the Commonwealth Court explained:

> [A] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they are guilty of disobedience, and *may be punished for contempt*.

[*Id.* at 103 (citing *West Pittston Borough v. LIW Invs., Inc.*, 119 A.3d 415, 421 (Pa. Cmwlth. 2015) (quoting *Wilson v. United States*, 221 U.S. 361, 376-77 (1911)))].

In a similar situation, the Superior Court held:

> [Corporate officers'] willful violation of the order in their capacity as directors, officers[,] and shareholders of the corporation was clearly contumacious and subject to a civil contempt citation, *regardless of whether* [corporate officers] *were joined as parties*. Where corporate officers knowingly disobey an injunction, the injunction can be enforced directly against those officers *even when they have not been joined as parties to the suit.* … [A] corporation acts only through its officers, agents, representatives[,] and employees, and if such persons are permitted to knowingly violate the terms of an injunction, it would be impossible for

- 18 -

> a court to ever enforce an injunctive order against a corporation[.] … Here, [corporate officers] were the sole shareholders, directors[,] and officers of [the corporation]. [Corporate officers] caused the corporation to be dissolved for the express purpose of avoiding its legal obligation to rebuild (or pay to rebuild) the retaining wall.
>
> ***Belle v. Chieppa***, … 659 A.2d 1035, 1039-40 ([Pa. Super.] 1995) ([c]itations omitted). Clearly, [Mr.] Heller can be held jointly liable for the contempt of Paramount.

TCO at 14-15, 16-18 (some brackets added; some citations omitted; emphasis in original).

*Participation Theory*

With this context, we now address Mr. Heller's arguments. To begin, Mr. Heller argues he "is not a party to the action, and should not be held in contempt for the actions of a corporation in a suit sounding in contract." Mr. Heller's Brief at 11 (emphasis omitted). Specifically, he claims the trial court erred in utilizing participation theory to find Mr. Heller in contempt, as "there is no precedent under Pennsylvania law for applying participation theory to cases sounding ultimately in contract." ***Id.*** at 12.[9] He argues the Consent

---

[9] Briefly, our Supreme Court has described participation theory and distinguished it from the related, but distinct, concept of piercing the corporate veil as follows:

> There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the

*(Footnote Continued Next Page)*

- 19 -

Judgment imposed obligations on Paramount, not himself. *See id.* Mr. Heller also claims he complied with the orders the trial court imposed on Mr. Heller in his personal capacity by attending the December 6, 2024 and December 30, 2024 hearings as directed. *See id.* at 12-13. He says the trial court never ordered him, personally, to take steps on behalf of Paramount to comply with the Consent Judgment and December 6, 2024 order. *Id.* at 13. He indicates the Commonwealth Court in *N. Strabane Township* relied on participation theory, and claims "[t]he DeNardos were held liable for statutory violations and for torts stemming from landslides caused by their corporations' statutory violations, but, notably, not breaches of contract." *Id.* at 15. Mr. Heller agrees "corporate officers *can* be held in contempt for a corporation's noncompliance … when that officer is responsible for directing or not correcting a corporate entity's tortious or illegal activity via participation theory," but reports he "could find *no instance* and no case law that supports the application of participation theory to contempt stemming from *contract disputes*." *Id.* at 13 (citation omitted; emphasis in original). Mr. Heller argues, unlike a victim of a tort, "a plaintiff in a *contract claim* was aware that its potential defendant was a corporation and implicitly accepted the

---

corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

*Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 89-90 (Pa. 1983) (cleaned up); *see also id.* at 90 ("Liability under [participation] theory attaches only where the corporate officer is an actor who participates in the wrongful acts.").

limitations on recovery imposed by the corporate structure." ***Id.*** at 17 (emphasis in original).

Initially, we must assess whether Mr. Heller has preserved his argument he should not be held in contempt for the actions of a corporation in a suit sounding in contract. Our examination of the record shows Mr. Heller asserted the following issues in his Rule 1925(b) concise statement:

> 1. The court abused its discretion and erred by finding [Mr.] Heller, in his individual capacity, in civil contempt for the actions of Paramount … where:
>
>> a.) The court order which Mr. Heller was found to violate, which was drafted by the [Funds], was not specific but, instead, was ambiguous, indefinite, and overly broad, as evidenced by the changing terms of at least one subsequently issued order;
>>
>> b.) The [Funds] failed to prove, by a preponderance of the evidence, that: 1) Mr. Heller had the ability to comply with, or ensure Paramount's compliance with, the court [o]rder; 2) the alleged act(s) of Mr. Heller actually violated the court order; 3) the alleged act(s) constituting Mr. Heller's alleged violation were volitional; and 4) that Mr. Heller acted with wrongful intent.
>
> 2. The court abused its discretion and erred by assessing a $2,050,000 civil contempt fine to be paid jointly and severally by Paramount and [Mr.] Heller, where the court's January 10, 2025[] opinion and order found that the term "profits" in its December 6, 2024 order was not clear enough to hold Paramount in contempt for the alleged violation of Section 2a. of the [o]rder and thus, the $50,000 fine provision at paragraph (1) pertaining to paragraph 2a. of its December 6, 2024 order should not have been included in its fine calculation, and a $50,000 fine beginning on December 14, 2024 and continuing through the court's Final order dated December 30, 2024 is $800,000[,] not $2,050,000.

Rule 1925(b) Statement, 2/28/25, at 1-2 (some capitalization modified).

Significantly, Mr. Heller did not raise in his Rule 1925(b) statement any issue pertaining to whether he could be held in contempt for the actions of a corporation in a suit sounding in contract. Under our Rules of Appellate Procedure, "[i]ssues not included in the [Rule 1925(b)] Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived." Pa.R.A.P. 1925(b)(4)(vii). **See also** Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."); **Greater Erie Indus. Dev. Corp. v. Presque Isle Downs, Inc.**, 88 A.3d 222, 225 (Pa. Super. 2014) (*en banc*) ("In determining whether an appellant has waived his issues on appeal based on non-compliance with Pa.R.A.P. 1925, it is the trial court's order that triggers an appellant's obligation[. T]herefore, we look first to the language of that order.") (cleaned up); Order, 2/10/25 (warning "[a]ny issue not properly included in the statement timely filed and served shall be deemed waived"). Accordingly, we find this issue waived.

Nevertheless, even if not waived based on Mr. Heller's Rule 1925(b) statement, this issue would also be waived based on Mr. Heller's failure to raise it below.[10] It is well-established "[i]ssues not raised in the trial court are

_____

[10] Mr. Heller's brief does not contain a statement of preservation of issues, in contravention of Pa.R.A.P. 2119(e). **See** Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.").

waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

Our review of his January 8, 2025 brief in opposition shows that Mr. Heller

made the following argument below with respect to participation theory:

> Mr. Heller agrees that corporate officers *can* be held in contempt for a corporation's noncompliance under Pennsylvania law when that officer is responsible for the corporation's failure. ***West Pittston Borough v. LIW Invs., Inc.***, 119 A.3d 415, 421 (Pa. [Cmwlth.] 2015) (citations omitted). While Mr. Heller is not a corporate officer of Paramount…, he agrees that his relationship with Paramount requires him to make good faith efforts to carry out this [c]ourt's [o]rder. [The Funds] cite[] to ***B&B Res., LLC v. Dep't of Env't Prot.***, 180 A.3d 812, 819-21 (Pa. Cmwlth[.] 2018) (citations omitted)[,] to support application of the participation theory here. That case is distinguishable from this case because it applies the participation theory in tort. ***Counsel have not found any cases applying the participation theory in matters involving contempt of court.*** [The Funds] fail[] to fully develop this theory of liability, therefore it should not be applied here.

Mr. Heller's Brief in Opposition, 1/8/25, at 6 n.3 (bold emphasis added). Mr.

Heller made no argument below that this case sounds in contract and

participation theory does not apply to contract disputes or contempt stemming

from contract disputes. Thus, this issue is waived on this basis as well.

*Ensuring Compliance with Orders*

Next, Mr. Heller argues he was unable to ensure compliance with the

trial court's orders, and the Funds failed to prove, by a preponderance of the

evidence, that he had the ability to do so, thereby suggesting contempt should

not have been found. Mr. Heller's Brief at 17; ***see also id.*** at 21. Specifically,

Mr. Heller insists he did not remove or terminate staff to avoid complying with

the Consent Judgment or the trial court's December 6, 2024 order. ***Id.*** at 18.

- 23 -

Instead, Mr. Heller claims Paramount was in severe financial distress and forced to lay off nearly all its employees on December 13, 2024, due to an inability to make payroll once Paramount was directed to tender its revenue to the Funds. *Id.* at 18-19. He asserts "[a] skeleton staff, consisting of solely [Mr. Heller] and a single part-time employee, Evan Leaman, remained on staff after December 13, 2024 — there was [*sic*] simply no funds to pay for other staff." *Id.* at 19 (citation omitted). He advances "Paramount and [Mr. Heller] were put in the impossible position of being required to produce voluminous records while being unable to retain any staff, due to all of its funds being redirected to [the Funds,]" and says the Funds "cannot have it both ways: they cannot demand large scale production but expect a single officer … and a part-time employee to do it all, for free." *Id.*

Further, to the extent the Funds and the trial court say Paramount misdirected funds to avoid complying with the orders and that is why there were no funds to pay employees, Mr. Heller maintains nothing in the record supports this conclusion. *Id.* at 19-20. He claims "[a]ny payments to Heller Capital Group, as alleged before the [t]rial [c]ourt, were proper payments of operational obligations." *Id.* at 20. He contends Heller Capital Group's Director of Finance — Dana Schickler — stated all $281,000 paid by Paramount to Heller Capital Group was for past due accounts payable, for services such as health insurance, payroll, human resources, and legal services for the employees that had already worked these hours. *Id.* (citation omitted). Mr. Heller advances "[t]hese funds were applied to delinquent invoices for back-

office services, and this process was directed by Ms. Schickler, not [Mr. Heller]. Notably, Heller Capital Group did not receive any additional funds after entry of the [December 19, 2024 o]rder." ***Id.*** (citation omitted).

No relief is due. Initially, Mr. Heller's argument seems to challenge the trial court's finding of contempt, not the purge conditions the trial court imposed, and thus we focus our review accordingly. ***See id.*** at 18 (outlining the elements a movant must establish to show a party is in contempt); ***id.*** at 21 (arguing the Funds failed to meet their burden for showing contempt); ***id.*** ("[T]here is no evidence supporting a finding of contempt against [Mr. Heller], a corporate officer."); ***see also id.*** at 17 (stating the Funds failed to prove, by a preponderance of the evidence, Mr. Heller had the ability to ensure compliance with the trial court's order).[11]

In moving for contempt, the Funds had to prove, by a preponderance of the evidence, that Mr. Heller violated a court order. ***In re Estate of DiSabato***, 165 A.3d at 992. The Funds presented evidence that information was either untimely conveyed, or not conveyed at all, by Paramount, despite Paramount's agreeing in the Consent Judgment to produce such information in a certain number of days. ***See*** Funds' Praecipe to File Stipulations, 12/29/24, at Exhibit 3 (Leigh Danca Aff.) at ¶¶ 22-24, 29-30; ***id.*** at Exhibit 4 (Brent Bauman Aff.) at ¶¶ 15-22.[12]

_____

[11] Mr. Heller contests the purge conditions imposed in a later issue *infra*.

[12] In Mr. Heller's argument, he does not dispute that information was either untimely conveyed, or not conveyed at all.

Mr. Heller then had the burden of proving the affirmative defense that he has the present inability to comply with the trial court's orders. *In re Estate of DiSabato*, 165 A.3d at 992. Mr. Heller only argues he was unable to provide such information to the Funds due to his having to lay off staff. We observe "[i]mpossibility is only a defense … where the inability to perform is not due to the defendant's own actions." *Com. ex rel. Ermel v. Ermel*, 469 A.2d 682, 685 (Pa. Super. 1983) (citation omitted). Here, the record supports the trial court's determination Mr. Heller failed to establish a defense. The Consent Judgment was entered on November 21, 2024, and the trial court's first contempt order was entered on December 6, 2024. Mr. Heller offers no explanation as to why the necessary information was not gathered and provided to the Funds between November 21, 2024 and December 12, 2024, before staff was terminated. Regarding his assertion he could not pay staff because Paramount was directed to tender its revenue to the Funds, we additionally observe the trial court did not order all profits, revenues, or any other revenue streams or proceeds generated by the Funds' ATM units to be remitted to the Funds until December 19, 2024, which was after staff had already been terminated.[13] Mr. Heller also does not address what caused Paramount's overall financial distress. Finally, he does not contend he and

---

[13] As mentioned *supra*, Paramount had previously interpreted the term 'profits' in the trial court's December 6, 2024 order to mean 'net profits,' instead of any return or gain generated by the Funds' ATM units. *See* Paramount's Brief in Opposition, 1/8/25, at 2-5 (arguing Paramount "remitted all 'profits' — meaning net profits, of which it had none — to the Funds from November 21st through December 19th").

Mr. Leaman could not produce the information sought at all. Thus, we are unconvinced the trial court abused its discretion in rejecting his defense.

*Fifth Amendment*

In his subsequent argument, Mr. Heller claims the trial court was not required to draw an adverse inference from his invocation of his Fifth Amendment rights. Mr. Heller's Brief at 21. He argues, "[w]hile the [t]rial [c]ourt was able to draw a negative inference from his invocation of his Fifth Amendment right, doing so in this context improperly created the implication that [Mr. Heller] was engaging in nefarious behavior related to various [o]rders, when the record does not support that conclusion." *Id.* at 22. With respect to the Fifth Amendment, Mr. Heller also confusingly argues:

> A careful review of the questions to which [Mr. Heller] invoked his Fifth Amendment privilege demonstrates that *even if* an adverse inference is imposed, it does not meet the standards for contempt. The questions were posed to [Mr. Heller] in a *personal* capacity and [he was] not testifying on behalf of Paramount in his capacity [as a] corporate officer. They covered topics ranging from Paramount's production of the master list of [the Funds'] ATMs; the status of Paramount's production of acquisition contracts; the status of Paramount's assignment of ATMs; the size of Paramount's ATM network; how Paramount was paying its attorneys; and the operation of Paramount's network. None of these questions concerned [Mr. Heller's] *personal* conduct, thus they cannot serve as the foundation for the imposition of personal liability.

*Id.* at 23 (emphasis in original; citations to record omitted).

Problematically, Mr. Heller failed to raise any Fifth Amendment issue in his Rule 1925(b) statement. Accordingly, we must deem this issue waived.

*See* Pa.R.A.P. 1925(b)(4)(vii), *supra*; Pa.R.A.P. 1925(b)(4)(ii), *supra*; *Greater Erie Indus. Dev. Corp.*, *supra*; Order, 2/10/25, *supra*.

Notwithstanding, even in the absence of Rule 1925(b) waiver, no relief would be warranted. To the extent Mr. Heller claims any adverse inference taken by the trial court implied nefarious behavior related to the orders that was not supported by the record, Mr. Heller engages in no discussion of the relevant facts to support this argument. *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. … This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may … find certain issues to be waived.") (cleaned up). Further, insofar as Mr. Heller confusingly challenges the questions asked of him, Mr. Heller does not point us to where he raised this argument about the questions posed to him below, and our own review of the record does not show he did so. *See* Pa.R.A.P. 302(a), *supra*; Pa.R.A.P. 2119(e), *supra*. He also cites no authority to support or clarify this argument. *Hardy*, *supra*. Thus, no relief is due on this basis.

*Civil Contempt Sanctions*

Mr. Heller next advances civil contempt sanctions cannot be punitive as they were against him. Mr. Heller's Brief at 23. Instead, he says "civil

contempt sanctions are meant to be coercive, *i.e.*, to pressure the party sanctioned to comply with the subject order." ***Id.*** at 23-24 (citation omitted). Mr. Heller argues that, at the time the contempt sanction was imposed on him, the trial court was aware there was no prospect for compliance with its order. ***Id.*** at 24. As a result, Mr. Heller insists the sanction was "no longer coercive and became punitive and, thus, not appropriate, as it move[d] from the realm of civil contempt to that of criminal contempt." ***Id.***; ***see also id.*** at 25 (asserting "the contempt sanctions were *intended* to be civil, but in this instance, they were improperly applied because, as a result of, *inter alia*, timing, they had no coercive effect") (emphasis in original). He concludes the trial court "clearly erred in imposing a punitive sanction of over $2 million on [Mr. Heller] in a personal capacity, for actions that involved private complainants, in an original action, seeking relief as private parties stemming from civil and not criminal acts." ***Id.*** at 25.

No relief is due. Again, we must deem this issue waived due to Mr. Heller's failure to raise it in his Rule 1925(b) statement. ***See*** Pa.R.A.P. 1925(b)(4)(vii), ***supra***; Pa.R.A.P. 1925(b)(4)(ii), ***supra***; ***Greater Erie Indus. Dev. Corp.***, ***supra***; Order, 2/10/25, ***supra***. Further, even if Rule 1925(b) waiver was not found, Mr. Heller does not point us to where he made this argument below, and our review of the record does not demonstrate he did so. ***See*** Pa.R.A.P. 302(a), ***supra***; Pa.R.A.P. 2119(e), ***supra***. Finally, Mr. Heller does not adequately explain why there was no prospect for compliance

with the trial court's orders, and it is not our duty to develop this argument on his behalf.  ***Hardy***, ***supra****.*

*Vague Meaning of the Term 'Profits'*

In Mr. Heller's final issue, he contends the sanctions imposed cannot date back to the period when the definition of 'profits' made the directive too vague to be enforced.  Mr. Heller's Brief at 25.  His entire argument on this issue consists of the following:

> The [t]rial [c]ourt eventually conceded that the term "profits" as used in its orders was not clear.  [TCO at 14-15].  This confusion as to the understanding of the term "profits" and how to determine what payments could be made directly affects the legally justifiable scope and size of the fine against [Mr. Heller], as well. In levying a fine based upon non-compliance with the "profits" portion of the 12/6 and 12/19 [o]rders, the [c]ourt erred in backdating the calculation to the period before December 13, 2024.  Any fines, if imposed, should date only from the entry of [the] 12/19 [o]rder (through December 30).  Recalculated, this amounts to a fine of $550,000.00.  At the very most, this should be the amount of the sanction imposed on [Mr. Heller].

***Id.*** at 26.

Mr. Heller's argument is lacking and unconvincing.  The trial court's December 6, 2024 order made handwritten revisions (signified in italics below) to the proposed contempt order submitted by the Funds, and stated:

> AND NOW, this *6th* day of December, 2024, upon consideration of [the Funds'] Emergency Motion for Contempt, and having held a hearing on the Emergency Motion on December 6, 2024, and it appearing to the [c]ourt that Paramount … has failed to comply with the Consent Judgment and Order of November 21, 2024, and the [c]ourt finding that Paramount is in **CONTEMPT** of [c]ourt; it is hereby **ORDERED** that the Emergency Motion is **GRANTED**, and is further **ORDERED** as follows:

1. Starting on December 7, 2024, Paramount … is assessed the sum of *$50,000* **per day** until it has purged itself of the contempt *in 2a. below.  Starting on December 14, 2024, Paramount … is assessed the sum of $50,000 per day until it has purged itself of the contempt in 2b and c.  The court directs that 2a. also includes all underlined language in paragraph 2 and 2b and c also contains the underlined language.*  The sum shall be paid by Paramount to the Prothonotary.  The Prothonotary shall remit any deposited sums to [the Funds] upon further [o]rder of the [c]ourt.

2. Paramount shall purge itself of the contempt by: (a) remitting to [the Funds] all profits generated by [the Funds'] ATM [u]nits from November 21, 2024 to the date Paramount's contempt is purged; (b) executing and delivering to [the Funds] a document assigning and transferring Paramount's right, title, and interest to [the Funds'] ATM [u]nits as well as the [l]ocation [a]greements, [p]ermits, ATM passwords and combinations, and all vendor and other contracts or agreements relating to [the Funds'] ATM [u]nits (excluding the communication modems installed in any of [the Funds'] ATM [u]nits[)]; and (c) supplying all of the following to [the Funds]:

   a. **Master List of Fund-owned ATMS**, which shall include a comprehensive list of all [F]und-owned ATMs.  At minimum, this list needs to include the following items for each Fund-owned ATM: i. ATM Serial Number; ii. ATM Terminal ID; iii. ATM Location; iv. ISO/Processor; and v. ATM Profile: Cash Management Provider and Maintenance Provider (First and Second line).

   b. **Processor Access**, which shall include the following information from each processor of Fund-owned ATMs (CDS, PAI, Switch Commerce, 1st ISO, DNS, etc.): i. Full administrative/management access to the online dashboard for each processor; and ii. Contact info for account managers for each processor.

   c. **Management Software**, which shall include following information for SMS ATA and any additional internal database(s) or industry management software(s)/data repositories utilized by Paramount to manage the Fund-owned ATMs: i. Full

administrative/management access to each program; and ii. Contact info for account managers for each program.

d. **Additional data**, specifically: i. Network Lists for each ISO involved with the portfolio; ii. Contracts between each ISO and sponsor bank(s); iii. Contact info for account managers/compliance personnel for each sponsor bank; and iv. Additional ATM information: 1. ATM make, model, serial number, number, rand capacity of cassettes; 2. Individual Vault, User, Service, Master, and Key Management passwords for each ATM; 3. ATM vault lock type; 4. Communication Method[:] a. Cell modem provider; b. RMS availability and passwords; 5. ATM compliance status; and 6. Any location agreements that were not provided by Paramount to [the Funds] in prior data transmittals.

3. Upon delivery of all items set forth in paragraph 2, Paramount shall file a certification with the [c]ourt that it has complied with this [o]rder. In turn, within 24 hours, [the Funds] shall file a certification verifying Paramount's compliance or non-compliance with paragraph 2.

4. Upon Paramount's compliance with paragraphs 2 and 3 of this [o]rder, and receipt of a confirmatory certification from [the Funds], Paramount shall be purged of the contempt.

Order, 12/6/24, at 1-3 (bold in original proposed order; italics signify handwritten revisions made by trial court and underlining added by trial court; formatting modified).

The trial court explained the revisions it made to the proposed order at the December 6, 2024 hearing, as follows:

THE COURT: Let's hold on for a second. [The Funds are] asking for an amount in the civil contempt for a purge to be set until the items on pages 2 and 3 [of the proposed order, containing the information sought by the Funds,] are delivered. And I was just looking at the … consent order for the $136 million. Where are all

of these items listed in these orders so that … the company shall be held in contempt for not producing each of these things?

[The Funds' counsel]: Directing the [c]ourt's attention to the order of the 21st, ordered that within two days of the date of this consent judgment order, [Paramount] shall supply the [Funds] a complete inventory of all ATM units purchased by [the Funds] or members of [the Funds] from [Paramount]. And further, [Paramount] shall assign and transfer to [the Funds] all [Paramount's] right, title, and interest to [the Funds'] ATM units as well as location agreements, permits, ATM passwords, and combinations, and all vendor and other contracts or agreements relating to [the Funds'] ATM units.

So I think that broadly covers what we tried to narrow down and make more specific in the contempt petition based on [the] review and testimony[ of Brent Bauman, whom the Funds retained to manage whatever exists of the Paramount network and help the Funds try to get the ATMs back up and running].

THE COURT: Okay. I agree with you that certainly on A on the proposed order. B, the processor access, what's your argument that that falls under? Is that ATM passwords or --

[The Funds' counsel]: Well, … it would be passwords and combinations as well as vendor agreements. Those are all intertwined concepts that would give us the ability to take over and run the network.

THE COURT: Okay. I'm just struggling a little with the specificity, which I think is appropriate in the order that you're proposing, but it's not as specific in the order to hold him in contempt for those specific things and set the financial purge.

This is what I'm going to do…. Rather tha[n] break it all apart – I think a purge is appropriate that you're asking for. I'm just going to put it out a week so that this information that you've appropriately identified in the order, which I do think matches up, I'm just not, from a due process perspective, convinced that every single thing is there. I'm going to push it out a week before--

[The Funds' counsel]: All right.

THE COURT: -- the next civil purge amount starts. If it's not provided in the detail that you requested, then the $100,000 a day will start at that point. That will be a week from today.

- 33 -

[The Funds' counsel]: All right.

THE COURT: Now, I'm certainly open to argument. The numbers -- the funds on ATMs have not been provided [*sic*]? I could break this purge up if you're requesting that.

[The Funds' counsel]: That would be a good start, Your Honor. Based on the evidence you heard today, I have a suspicion and a fear that, in fact, this ATM network has far less than the represented 25- or 30,000.

THE COURT: It certainly appears to have way less based upon the evidence.

[The Funds' counsel]: And we know anecdotally that these ATM units, the ones that actually exist and are real, are going down at a rapid clip. So the sooner we can get our arms around--

THE COURT: Okay.

[The Funds' counsel]: - which one a [*sic*] real -

THE COURT: This is what I'm going to do. I'm going to set a $50,000 purge starting today with a -- that provides the master list of the ATMs.

[The Funds' counsel]: And, Your Honor, I think it's fairly encompassed in the order, but that should include the location of these ATMs.

THE COURT: I agree, yeah. That's included in A. So that will start today. Another $50,000 will kick in if the additional information is not provided by next week.

I'll handwrite this on this order so it doesn't slow anything down…, rather than you submitting another one, unless you can submit one within the next 45 minutes, but I'll just take care of it then in my chambers.

N.T., 12/6/24, at 34-37; ***see also id.*** at 12-13.[14]

The record shows that, contrary to Mr. Heller's argument, the trial court

did not impose any contempt fine based on his non-compliance with the

_____

[14] Mr. Heller and his personal counsel were present at this hearing. **See** N.T. at 3.

'profits' provision of the trial court's orders. The trial court conceded that the term 'profits' was not clear and therefore determined Paramount could not be held in contempt on that basis. TCO at 14-15. Nevertheless, it found that Paramount failed to certify compliance, did not provide a complete inventory of all Fund-owned ATMs, and did not timely provide data regarding the Funds' ATMs; it therefore assessed fines pursuant to the order set forth *supra*. **See id.**[15] Mr. Heller does not argue that any of the trial court's directives regarding those items were unclear or indefinite, or that he cannot be found in contempt and assessed fines with respect to these items because the term 'profits' was vague in a different provision for which he was not found in contempt.[16] Accordingly, Mr. Heller's cursory argument does not persuade us relief is due.

---

[15] The $50,000/day contempt fine started on December 7, 2024, when, among other things, a comprehensive list of all Fund-owned ATMs was not provided. An additional $50,000/day contempt fine began on December 14, 2024, as the contempt continued and compliance with the order was not certified.

[16] Mr. Heller also does not challenge the amount of the trial court's contempt fine on any basis other than the term 'profits' being vague, and fails to discuss the trial court's December 6, 2024 order in any detail.

Order affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>8/10/2026</u>